

Neutral Citation Number: [2023] EWHC 3282 (Comm)

Case No: CL-2016-000151

**IN THE HIGH COURT OF JUSTICE**
**KING'S BENCH DIVISION**
**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**
**COMMERCIAL COURT**

Royal Courts of Justice, Rolls Building
Fetter Lane, London, WC4A 1NL

Date: 19 December 2023

**Before** :

**MR JUSTICE BRIGHT**

- - - - - - - - - - - - - - - - - - - - -

**Between :**

| | |
|---|---|
| **Louis Emovbira Williams** | **Claimants** |
| - and - | |
| **(1) Federal Government of Nigeria**<br>**(2) Attorney General of the Federal Government of Nigeria** | **Defendants** |

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

Mr Oluwole A Ogunbiyi (instructed by Westbrook Law) for the Claimants
Mr Abiud Kaihiva (instructed by Gromyko Amedu) for the Defendants

Hearing dates: 15, 19 December 2023
- - - - - - - - - - - - - - - - - - - - -

# Approved Judgment

.............................

**Mr Justice Bright:**

1. This judgment primarily concerns the application of the Defendants, issued on 28 September 2020, for an order setting aside the default judgment granted in favour of the Claimant ("Dr Williams") on 9 November 2018 ("the 2018 Judgment"). It also concerns the application of the Claimant, issued on 9 October 2023, for an order that the Defendants' application be dismissed as an abuse of process and that the Defendants not be permitted to take any further steps to set aside the 2018 Judgment without first paying Dr Williams's costs to date and/or providing security for costs.

2. Dr Williams is a Nigerian national who has for some time been resident in the UK. The underlying claim that gave rise to the 2018 Judgment concerns events that mostly occurred a long time ago. They make for an unhappy story, so it is important to stress from the outset that the current Government of Nigeria had no involvement.

**Representation**

3. The Defendants were represented at the hearing by Mr Abiud Kaihiva, instructed by Gromyko Amedu. Dr Williams was represented by Mr Oluwole A Ogunbiyi, instructed by Westbrook Law.

4. Unusually, Mr Ogunbiyi was the person on the record as acting for the Defendants from 6 August 2020 (when he sent the court a Notice of Acting dated 6 July 2020) until 15 March 2021 (when Gromyko Amedu filed a Notice of Change). Mr Ogunbiyi assured me, orally and in writing, that he received no instructions at all from the Defendants at any stage, and that before accepting instructions on behalf of Dr Williams he first checked the propriety of doing so with the Ethics Department of the Bar Council. I have also been assured by Westbrook Law that they and Dr Williams still wish to instruct Mr Ogunbiyi to represent Dr Williams, rather than any other counsel.

5. The Defendants objected to Dr Williams being represented by Mr Ogunbiyi, on the basis that there was a conflict of interest and that for Mr Ogunbiyi to appear constituted a breach of Rule 21 of the BSB Code of Conduct. I cannot say whether Mr Ogunbiyi is or is not in breach of this or any other Rule without an investigation into the circumstances, which is beyond the scope of this hearing and would, anyway, not be for me to decide.

6. Ultimately, it is for Dr Williams and Westbrook Law to decide which Counsel to instruct; and it is for Mr Ogunbiyi to decide whether or not he can accept such instructions. I adjourned the hearing for a while to enable these parties to confirm their positions, which they did. I received written confirmation that Dr Williams and Westbrook Law both knew of Mr Ogunbiyi's previous role on behalf of the Defendants, but have made the informed and considered choice to use him as Counsel.

7. The Defendants insisted that, contrary to the assurances given to me by Mr Ogunbiyi, he did indeed receive instructions and information during the period when he was on the record for them. They therefore maintained their objections, as they are entitled to do, and asked me to refer the matter to the BSB. I do not consider that I can or should do so, in circumstances where I do not have sufficient information to know whether or not any breach of the Code of Conduct has occurred. The Defendants can of course do so themselves, if they wish.

8.  None of this has any direct bearing on the issues I have to decide or the hearing, which I see no reason to adjourn any further. Whatever information or instructions Mr Ogunbiyi may have received from the Defendants (if any) in 2020 or 2021, none of it has been relied on at this hearing, which has turned solely on the evidence of Dr Williams (on the one hand) and the Defendants' solicitor, Mr Amedu (on the other). There is no indication that Dr Williams has received any unfair advantage today by being represented by Mr Ogunbiyi, rather than any other Counsel, and Mr Kaihiva has not suggested this.

9.  The Defendants have known for some time that Mr Ogunbiyi was instructed on behalf of Dr Williams. They first raised this in a letter of 25 October 2023. If they wished to prevent Mr Ogunbiyi from acting, they have had plenty of time to apply for injunctive relief, but have not made any application.

**Background**

10. Dr Williams's case is that, in 1986, he was persuaded by an agent of the First Defendant, the Federal Government of Nigeria, to arrange for the payment US$6,520,190, which he guaranteed, to an individual in the UK, also acting on behalf of the Federal Government of Nigeria, who received it as a trustee. This was in connection with a transaction for the importation of foodstuffs into Nigeria. The US$6,520,190 was then held on trust by the trustee, as agent for the Federal Government of Nigeria, on an express trust for Dr Williams. This sum was to be held by the trustee in England, pending the release in Nigeria of funds to pay for the foodstuffs.

11. The trustee, acting on behalf of the Federal Government of Nigeria, fraudulently paid US$6,020,190 into a bank account held in England by the Central Bank of Nigeria, which then transferred this sum to an account of the Federal Government of Nigeria. The trustee took the balance of US$500,000 for himself.

12. In May 1986, Dr Williams travelled to Nigeria. He was arrested by the Nigerian State Security Service. His personal bank accounts in Nigeria were frozen and the contents were then confiscated. He was brought before a military tribunal, tried and convicted of economic sabotage. He was sentenced to 10 years in prison and a fine of 150 million Naira.

13. The constitution of Nigeria required the conviction to be ratified by the President in order to take effect. The President (at that time, President Babangida) declined to ratify the conviction. Dr Williams was released from prison in 1989 and returned to the UK. A special panel was established in Nigeria to review the case. It reported in 1993 that Dr Williams had been guilty of no wrongdoing or unlawful conduct and recommended that the money taken from him be repaid.

14. Dr Williams was formally pardoned by President Babangida on 23 August 1993. The President also promulgated a decree of 29 September 1993 ("the Fidelity Guarantee"), which directed the Central Bank of Nigeria to pay Dr Williams US$6,520,190, plus a further US$ amount representing the sums confiscated from his bank accounts in Nigeria, with compound interest at 17.5%.

15. However, Dr Williams did not get his money back, even despite further written assurances in 2009 from the President (at that time, President Yar'Adua) and from the Governor of the Central Bank of Nigeria.

**These proceedings**

16. Dr Williams finally commenced proceedings against the Defendants in this action on 8 March 2016. The claim form gave the address for service as: "Nigerian High Commission, 9 Northumberland Avenue, London W2N 5BX". The circumstances in which proceedings were commenced on this basis, and the manner in which the relevant documents were then served, I will examine in more detail later in this judgment.

17. The Particulars of Claim put Dr Williams's case in two ways, in paragraph 46:

    i)  First, under the Fidelity Guarantee he claimed the amounts provided by that instrument, together with interest at the stipulated rate.

    ii) In the alternative, he claimed US$6,520,190 on the basis of the Federal Government of Nigeria's fraudulent breach of trust, and said that he was entitled to trace the US$6,020,190 that the Federal Government of Nigeria received via the Central Bank of Nigeria.

18. On 21 December 2017, Dr Williams filed a certificate of service. This stated that the claim form, Particulars of Claim and response pack were served by first class post to the Nigerian High Commission, at the address set out on the claim form. Dr Williams's covering letter explained that service was effected on 18 March 2016, but that he had been unaware that he needed to file a certificate of service.

19. On 24 January 2018, Dr Williams issued an application for default judgment, supported by his First Affidavit dated 22 January 2018.

20. On 26 February 2018, Robin Knowles J directed that Dr Williams's application for default judgment would not be dealt with on papers but must be served on the Defendants and then listed for a hearing.

21. The application was served by a letter from Dr Williams's solicitors to the Nigerian High Commissioner, Ambassador George Oguntade, dated 5 March 2018. Dr Williams followed this up with an email to the Social Secretary to the High Commissioner, who responded on 15 March 2018 confirming that he would forward the documents to the High Commissioner.

22. On 7 June 2018, Dr Williams made his First Witness Statement in support of the application for default judgment.

23. Dr Williams's solicitors sent several letters to the Nigerian High Commission, stating that they wanted to fix a hearing date but received no response. Dr Williams again followed up with an email to the High Commissioner's Social Secretary, who acknowledged receipt by an email of 7 September 2018 and again said that he would pass the letter from Dr Williams's solicitors to the High Commissioner. The Defendants took no part in fixing the hearing date and the court was told by a letter

from Dr Williams's solicitors that the High Commissioner had said that the Federal Government of Nigeria did not propose to instruct lawyers and would not attend.

24. On 5 November 2018, Dr Williams made his Second Affidavit, in support of the application for default judgment. He said that this was intended to supplement the information in his First Affidavit.

25. The hearing took place before Moulder J on 9 November 2018 with Dr Williams represented by Counsel (who had provided a skeleton argument on the previous day), but with no representation or attendance on the part of the Defendants.

26. In her judgment, Moulder J referred to the letters sent by Dr Williams's solicitors to the Nigerian High Commission and the responsive email, from which she concluded that the Defendants were aware of the proceedings but had decided not to attend.

27. Next, Moulder J noted that the proceedings had been stayed automatically under CPR 15.11, because of the inactivity from March 2016 until January 2018. She decided to lift the stay.

28. Turning to Dr Williams's entitlement to default judgment, Moulder J did not give default judgment on the first basis asserted by Dr Williams, i.e., his claim under the Fidelity Guarantee. She was not persuaded that there was an exemption to the state immunity that the Federal Government of Nigeria is normally entitled to enjoy under the State Immunity Act 1978. This was because, despite its title, the Fidelity Guarantee was not a guarantee in the sense in which that word is normally used. It was a governmental decree, with the character of a law or statute, and thus an exercise of sovereign authority of precisely the kind that attracts state immunity. She also rejected an argument that the terms of the Fidelity Guarantee constituted a prior written agreement by which the Federal Government of Nigeria submitted to the jurisdiction of the courts of this country.

29. However, she accepted the argument of Dr Williams that his alternative claim was one arising from a commercial transaction within section 3(1)(a) of the State Immunity Act 1978, so that there was no state immunity. She referred to *Kuwait Airways Corp v Iraqi Airways Co (No. 1)* [1995] 1 WLR 1147, which Counsel appearing before her had drawn to her attention as stating that the phrase "commercial transaction" is very broadly defined in section 3(3).

30. In relation to service, Moulder J noted that Dr Williams relied on section 12(6) of the State Immunity Act 1978, on the basis that the Federal Government of Nigeria had agreed to service being effected on the High Commission in London. She referred to the evidence before her and said that the requirements of section 12(6) were satisfied. She was also satisfied that such service had been effected, noting Dr Williams's evidence in paragraph 8 of his First Affidavit, and also the certificate of service.

31. She therefore gave default judgment in the sum of US$6,520,190. She also awarded interest at 4% from 1 June 1986 to 9 November 2018, which amounted to US$8,466,600.09. In form, Moulder J's judgment was against both Defendants.

32. Moulder J's judgment was served on the Federal Government of Nigeria through diplomatic channels, in accordance with section 12(5) of the State Immunity Act 1978, on 23 December 2019.

33. The application notice seeking to have that judgment set aside was issued on 28 September 2020, i.e., nine months after service of the judgment. It was issued by Gromyko Amedu, but at this time Gromyko Amedu were not on the record for the Defendants. The person on the record as acting on the Defendant's behalf was still Mr Ogunbiyi. Gromyko Amedu did not come onto the record until 15 March 2021.

34. It then took over two and half years for this matter to be listed. My understanding is that the Defendants did not ask the court for a hearing date until September 2023.

**The Defendants' application to set aside the default judgment**

35. In their application, the Defendants did not assert that the Federal Government of Nigeria has any defence on the merits. Although Mr Amedu's evidence has said that the Dr Williams's case is disputed, he has not explained why. He does not state that he knows or believes any of the underlying factual allegations to be incorrect, and his witness statements do not refer to any sources of information that would enable him properly to do so.

36. Accordingly, there is no positive challenge to the essence of Dr Williams's case. This includes his allegations that both (i) the person who persuaded him to become involved in financing the transaction and (ii) the trustee were acting at all material times as agents of the Federal Government of Nigeria.

37. I therefore understand the Federal Government of Nigeria does not really dispute, except in formal terms, that Dr Williams is the victim of a fraudulent breach of trust, committed against him in 1986 by the Federal Government of Nigeria. At any rate, no positive defence is asserted to contradict what Dr Williams says about the events in 1986.

38. The grounds raised in the Defendants' application notice are as follows:

    i) The claim form and Particulars of Claim were not served in compliance with section 12(1) of the State Immunity Act 1978.

    ii) The claim form was not served outside the jurisdiction within six months, following its issue on 8 March 2016.

    iii) The Federal Government of Nigeria is immune from the jurisdiction of the English courts under section 1 of the State Immunity Act 1978.

**Section 12(1) and (6) of the State Immunity Act 1978**

39. The majority of the evidence and submissions that I received related to the first of these grounds. They concerned section 12(1), (2) and (4) and (6) of the State Immunity Act 1978, which provide as follows:

> "**12 Service of process and judgments in default of appearance.**
>
> (1) Any writ or other document required to be served for instituting proceedings against a State shall be served by being transmitted through the Foreign, Commonwealth and Development Office to the Ministry of Foreign Affairs of the State and service shall be deemed to have been effected when the writ or document is received at the Ministry.
>
> (2) Any time for entering an appearance (whether prescribed by rules of court or otherwise) shall begin to run two months after the date on which the writ or document is received as aforesaid.
>
> (3) A State which appears in proceedings cannot thereafter object that subsection (1) above has not been complied with in the case of those proceedings.
>
> (4) No judgment in default of appearance shall be given against a State except on proof that subsection (1) above has been complied with and that the time for entering an appearance as extended by subsection (2) above has expired.
>
> …
>
> (6) Subsection (1) above does not prevent the service of a writ or other document in any manner to which the State has agreed and subsections (2) and (4) above do not apply where service is effected in any such manner."

40. Mr Kaihiva submitted that, if he succeeded on this ground, it would follow that the Federal Government of Nigeria was never properly served, so that time for acknowledgment of service never began to run; which would in turn mean that the conditions in CPR 12.3(1) were not satisfied; therefore this would be a case where the court must set aside the default judgment, under CPR 13.2(a).

41. Mr Ogunbiyi said that I should reject the fundamental premise of this ground – namely, that service had to be effected in compliance with section 12(1) of the State Immunity Act 1978. His submissions were along similar lines to those made by Dr Williams's previous Counsel before Moulder J. He said that the Federal Government of Nigeria had agreed to accept service in London on the High Commission, within section 12(6) of the State Immunity Act 1978. The Defendants did not accept this.

**Dr Williams's evidence as to the alleged agreement**

42. Dr Williams's case on this point has been set out in a number of different documents, not always in precisely identical terms. It is necessary to go through all of them in turn.

43. In his First Affidavit of 22 January 2018, he said that he had been advised by his lawyers in Nigeria (whom he did not name) that the Attorney General had suggested that, to bring matters to a head, "I should issue proceedings in London to recover my monies and that the Nigerian High Commission in London would accept service of such proceedings."

44. The evidence in Dr Williams's First Witness Statement of 7 June 2018 was similar to that in his First Affidavit.

45. In his Second Affidavit of 5 November 2018, Dr Williams went into more detail. He said that, before the claim form was issued, his leading counsel in Nigeria (whom he named as Chief Femi Falana), and his lawyer in Nigeria (whom he named as Mr Dotun Sowemimo) were in contact with the Ministry of Justice and various others in Nigeria.

In particular, in February 2016, Mr Sowemimo spoke in person to the Solicitor General, whom Dr Williams named as Mr Tayo Abidogun. Dr Williams said that the Solicitor General advised Mr Sowemimo to arrange a meeting between Chief Falana and the Attorney General, but that Dr Williams should commence proceedings in the meantime: "I should go ahead and serve the process on the acting High Commissioner in London by delivering the relevant claim papers to the High Commission and that he would instruct the Acting High Commissioner to accept service and then send the papers to the Attorney General in Abuja."

46. Dr Williams also stated that, before issuing the claim form, he spoke to the acting High Commissioner, Ambassador Olukunie Bamgbose, who confirmed that he had been instructed to accept service in London at the High Commission and would then pass on the papers to the Attorney General.

47. Dr Williams said that this all occurred, and that Mr Sowemimo received confirmation from the Ministry of Justice in Nigeria that they had received the documents, which were then delivered to the Attorney General in Abuja. Dr Williams said that the matter was then taken up by Chief Falana with the Attorney General, and he exhibited correspondence between his leading counsel and the Attorney General, confirming this.

48. Separately, Dr Williams said that, after the direction made by Robin Knowles J on 26 February 2018, he spoke to the new High Commissioner in London, Ambassador George Adesola Oguntade, who confirmed that he would be happy for the application for default judgment to be served on him and that he would forward it to the Attorney General.

49. In his Second Witness Statement of 9 October 2023, which was made in support of his cross-application issued on that date, Dr Williams said that Chief Falana had held discussions with the Attorney General and Solicitor General and: "The solicitor general agreed that if proceedings were issued against the FGN in England that he would instruct the Ambassador in London to accept service of my intended proceedings."

50. In his Third Witness Statement of 4 December 2023, Dr Williams said that the Solicitor General spoke in February 2016 to Chief Falani and to Mr Sowemimo and recommended a meeting between the Attorney General and Chief Falani, but that legal proceedings be commenced in England. He then said: "The Solicitor General told my lawyer, Mr Sowemimo, that I should go ahead and serve the process on the acting High Commissioner in London by delivering the claim papers to the High Commissioner and that he, the Solicitor General, would instruct the Acting High Commissioner to accept service and then send [the] papers to the Attorney General in Abuja."

51. While there are some small differences between the various different versions of Dr Williams's evidence, it is generally clear and essentially consistent, as follows:

    i) His lawyers in Nigeria told various people in Nigeria that he was contemplating commencing proceedings in London. The Attorney General and the Solicitor General therefore were aware of this in advance.

    ii) There was a conversation between Mr Sowemimo and the Solicitor General, in which the Solicitor General said that the claim form should be delivered to the

> High Commission, and that he would instruct the Acting High Commissioner to accept service and send the papers to the Attorney General in Abuja.
>
> iii) Ambassador Bamgbose confirmed to Dr Williams that he had been given such instructions, as Acting High Commissioner.
>
> iv) The claim form and Particulars of Claim were then sent to the High Commission.
>
> v) In due course, they were forwarded to the Attorney General in Abuja.

52. This is what I understand to be Dr Williams's case as to the agreement on which he relies, for the purposes of section 12(6) of the State Immunity Act 1978.

**The evidence of the Defendants as to the alleged agreement**

53. In response, the Defendants served evidence from its solicitor, Mr Gromyko Amedu. Mr Amedu's First Witness Statement of 28 September 2020 relied on section 12(1) of the State Immunity Act 1978, but did not address Dr Williams's evidence that there had been an agreement within section 12(6).

54. In his Third Witness Statement of 23 October 2023, Mr Amedu responded to the evidence served by Dr Williams. On this particular point, in paragraph 24, Mr Amedu referred to Dr Williams's evidence that there had been an agreement with the Solicitor-General of Nigeria in February 1986 and said that this evidence was "incorrect, and intended to mislead the court on the issue of validity of the service of the claim for the reason set out below."

55. Mr Amedu then said that he understood Dr Williams to be suggesting that the High Commissioner had submitted to the jurisdiction in March 2016, which he again said was incorrect. More specifically, he said that Dr Dalhatu Sarki Tafida left office as Ambassador/High Commissioner to the Nigerian High Commission in London in August 2015, following which there was no High Commissioner until the appointment of Ambassador Oguntade on 9 October 2017; there was no High Commissioner designate in March 2016. This is what I understand Mr Amedu to have meant by "the reason set out below".

**Analysis and conclusion on the alleged agreement under section 12(6)**

56. Although Mr Amedu denies the existence of the agreement (on behalf of the Federal Government of Nigeria), he does not do so on the basis of any documentary record or any information emanating from the Solicitor-General said to have made this agreement on behalf of the Federal Government of Nigeria, i.e., Mr Abidogun. The only reason given by Mr Amedu for denying the existence of such agreement is the fact that there was no High Commissioner between August 2015 and October 2017.

57. Relying on the mere fact that there was no High Commissioner at the relevant time does not go far enough. In his First Affidavit, (which was admittedly light on detail) Dr Williams said that the agreement was that "the Nigerian High Commission" would accept service – not that the High Commissioner would do so. In his Second Witness statement, Dr Williams said that the Solicitor General said that he would instruct "the

Ambassador in London" – but this was on any view loose language, this being the wrong title for the senior person within the High Commission. When he provided more detail in his Second Affidavit – made as long ago as November 2018, long before Mr Amedu's evidence that there was no High Commissioner in February/March 2016 – Dr Williams said that the Solicitor General referred to the Acting High Commissioner: his evidence was that the Solicitor General said that the claim form should be delivered to the High Commission, and that he would instruct the Acting High Commissioner to accept service and forward the documents to the Attorney General.

58. Mr Kaihiva said that Dr Williams's evidence about the agreement reached with the Solicitor General was hearsay about a mere oral agreement and should not be given any weight. However, it is the only evidence that I have available, and it has been repeated by Dr Williams several times. I consider that I have not been given any real reason not to accept it.

59. Furthermore, Dr Williams's evidence that in March 2016 he spoke to the acting High Commissioner, Ambassador Bamgbose, who confirmed that he had received such instructions, tends to corroborate Dr William's case on this point. So, too, does the evident fact that the claim form was in fact forwarded to the Attorney General.

60. Mr Amedu does not deny any of the following:

    i)   The Solicitor General in February 2016 was Mr Abidogun.

    ii)  It was in Mr Abidogun's power, as Solicitor General, to make an agreement of this kind, on behalf of the Federal Government of Nigeria.

    iii) Conversations such as Dr Williams asserts may have taken place, in particular between Mr Abidogun and Mr Sowemimo.

    iv)  Although there was no High Commissioner in February/March 2016, Ambassador Bamgbose was the Acting High Commissioner.

    v)   At all events, Mr Abidogun, as Solicitor General, appears to have instructed Ambassador Bamgbose to be the Acting High Commissioner in this specific regard, in the sense of acting as High Commissioner by accepting service and forwarding the documents to the Attorney General.

61. I therefore accept that, on the evidence presented to me, it seems likely that the Federal Government of Nigeria agreed to accept service by delivery to the High Commission in London, as duly happened. This was an agreement within section 12(6) of the State Immunity Act 1978.

**Claim form not served out of the jurisdiction in time**

62. The second ground of the Defendants' application notice was that the claim form was not served out of the jurisdiction within six months.

63. Mr Ogunbiyi did not argue that Dr Williams did serve the claim form out of the jurisdiction, or that he had the permission of the court to do so. Dr Williams's case depended entirely on there having been an agreement that service could be effected in England, on the High Commission in London.

64. I understood Mr Kaihiva to accept that, if there was such an agreement, then the second ground could not assist.

**State immunity under section 1**

65. The third ground of the Defendants' application notice was that the Federal Government of Nigeria is entitled to immunity under section 1 of the State Immunity Act 1978.

66. I have already noted that Dr Williams's case is that his claim arises out of a commercial transaction, and that the facts of that transaction and of the fraud perpetrated on him by the Federal Government of Nigeria have not been put in issue, except in the most formal sense. Moulder J saw this as a case that clearly fell within section 3(1)(a) of the State Immunity Act 1978. The evidence has not moved on since her decision in 2018. I agree with her.

67. I would only add that, given the terms of the trust agreement that is central to Dr Williams's complaint – i.e., that the funds guaranteed by him were to be held on trust by a trustee in England, acting on behalf of the Federal Government of Nigeria – it also seems to me to fall within section 3(1)(b).

68. Accordingly, the Federal Government of Nigeria does not have immunity from the proceedings in this action.

**Dr Williams's cross-application**

69. The first ground of the cross-application was that the Defendants' application notice was issued on its behalf by Gromyko Amedu, at a time when Gromyko Amedu had not come onto the record. I do not see that this matters. Even if Gromyko Amedu acted without authority in September 2020 (and that seems unlikely), the Defendants have since adopted and ratified whatever steps Gromyko Amedu took prior to 21 March 2021.

70. The second ground was the Defendants' delay in bringing this application forward. The delay in question has indeed been both prodigious and unexplained. Indeed, despite Dr Williams's cross-application, Mr Amedu did not provide any real explanation for the fact that the Defendants' application notice was issued in September 2020, but not listed for hearing until three years later. Nevertheless, I would not have dismissed the Defendants' application merely on this basis, if the application had had any substance – in particular, if I was persuaded that this court did not have jurisdiction under the State Immunity Act 1978.

71. However, none of this arises, in circumstances where the Federal Government of Nigeria cannot rely on the State Immunity Act 1978, in terms of immunity from the proceedings. In the circumstances, the only relevance of delay is in relation to costs, where it could in principle affect my discretion.

**Conclusion**

72. The Defendants' application is dismissed. The cross-application is also dismissed.