## A.O.E LAW & ASSOCIATES
### A PROFESSIONAL LAW CORPORATION
Bunker Hill Tower
800 W. 1st Street, Suite 400
Los Angeles, CA 90012
Call: 213.620.7070 Fax: 213.620.1200

Anthony O. Egbase, *Esq.*\*
Shana Y. Stark, *Esq.*

Gerald o. Egbase, esq
Aliyah j. Guidry, Esq.
Debra Williams (*Manager*).

September 25, 2024

**VIA ECF**

The Honorable. Lewis J. Liman
United States District Court Judge
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:    **Defendants Reply To Plaintiff's Notice of Supplemental Authority
Dr. Louis Emovbira Williams v. Federal Government of Nigeria et. al
Case Index No. 23 cv. 7356 (LJL)(SDA**)

**PRETRIAL STATUS UPDATE PENDING INTERLOCUTORY APPEAL**

Dear Judge Liman:

Our firm represents Defendants Federal Government of Nigeria and Attorney General of the Federal Government of Nigeria ("Defendants"), in the above-referenced matter.  In this action, Plaintiff seeks recognition of a foreign judgment rendered in the United Kingdom.

Defendants respectfully write to update the Court about the parties' posture regarding further litigation of this proceeding in the District Court following the Defendants FGN and AG-FGN appeal of the District Court's Opinion and Order of August 12, 2024, as docketed in the Second Circuit as Case no. 24-2329.[1]  Recently, the Defendants filed an action in the United Kingdom to set aside the foreign judgment on the grounds that it was procured with fabricated

---

[1]A defendant's motion to dismiss on sovereign immunity grounds is an immediately appealable collateral order. *Rein v. Socialist People's Libyan Arab Jamahiriya, 162 F.3d 748, 755–56 (2d Cir.1998).*  See also  *Atlantica Holdings v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 813 F.3d 98, 116 (2d Cir. 2016).  See. also *Rein v. Socialist People's Libyan Arab Jamahiriya (2d Cir. 1998) 162 F.3d 748, 755-56.*

documents (i.e., the Fidelity Guarantee) and fraud. A copy of the Particulars of Claim filed by the Defendants in the United Kingdom action is submitted herewith as Exhibit 1.

On August 23, 2024, the parties, through their respective counsel, had a conference wherein we discussed the subsequent progression of the litigation of this proceeding during the Defendants' appeal.   During the conference, the parties discussed stipulating to a limited stay of this action pending the outcome of the appeal[2] and, as an accommodation to Plaintiff, to proceed with limited discovery of the Plaintiff.

Afterward, the Defendants (FGN and AG-FGN) submitted a proposed stipulation in this regard to all parties. Notwithstanding numerous representations over several weeks that Plaintiff would provide comments or proposed revisions to the Stipulation, Plaintiff has failed to do so.

In light of Plaintiff's failure to respond to the proposed stipulation and in an effort to avoid unnecessary motion practice, we respectfully request that the court schedule a conference so that the proposed stipulation can be addressed in a meaningful way.

We thank the Court for its attention and courtesies in this matter.

Respectfully submitted,

*/s/ Gerald O. Egbase*
Gerald O. Egbase
**AOE Law & Associates**
800 W. 1st Street, Suite 400
Los Angeles, California 90012
Tel:(213)620-7070
Email:ge-aoe@baselaw.net

Attachment

Cc: Via ECF
David H. Fromm, Esq

---

[2]Defendants appeal the Court's Opinion and Order on, *inter alia*, sovereign immunity grounds. Defendants believe that a stay is appropriate because "immunity is more than a simple defense - it is 'an entitlement not to stand trial or face the other burdens of litigation, . . . " *Noel Pane v. City of Greenburgh*, No. 07-cv-3216 (LMS), 2012 WL 12886971, at *4 (S.D.N.Y. March 21, 2012) (quoting *Loria v. Gorman*, 306 F.3d 1271, 1281 (2d Cir. 2002)). See also.   *Atlantica Holdings v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 813 F.3d 98, 116 (2d Cir. 2016) ("sovereign immunity is conceptualized as immunity from suit, and not just immunity from liability[.]")

Baruch S. Gottesman, Esq.
Steven B. Feigenbaum, Esq.
Fred G. Wexler, Esq.
Robert J. Brown, Esq.

# EXHIBIT #1

**(Defendants FGN and AG-FGN Particulars of Claim
filed in the United Kingdom)**



| | In the | **High Court of Justice** |
|---|---|---|
| | | **Business and Property Courts of** |
| **Claim Form** | | **England and Wales** |
| | | **King's Bench Division** |
| | | **Commercial Court** |

25 June 2024



| | *for court use only* | CL-2024-000452 |
|---|---|---|
| Claim no. | | |
| Issue date | | |

**Claimant(s)**

(1) FEDERAL GOVERNMENT OF NIGERIA (2) ATTORNEY GENERAL OF THE FEDERAL GOVERNMENT OF NIGERIA both of Federal Ministry of Justice, Plot 71B Shehu Shagari Way, Maitama Abuja, Nigeria

SEAL

**Defendant(s)**

LOUIS EMOVBIRA WILLIAMS
of Flat 1, Park Court, 41 Canning Road, Croydon, CR0 6QE

Name and address of Defendant receiving this claim form

LOUIS EMOVBIRA WILLIAMS
Flat 1, Park Court, 41 Canning Road, Croydon
Surrey
CR0 6QE

| | £ |
|---|---|
| Amount claimed | |
| Court fee | £626 |
| Legal representative's costs | TBC |
| **Total amount** | TBC |

The court office at the Admiralty and Commercial Court Listing Office, Rolls Building, 7 Rolls Buildings, Fetter Lane, London EC4A 1NL is open between 10 am and 4.30 pm Monday to Friday. When corresponding with the court, please address forms or letters to the Court Manager and quote the claim number.

**N1(CC)** Claim form (CPR Part 7) (09.22)                                                                 © Crown copyright 2022

| Claim No. | |
|---|---|

**Brief details of claim**

Since 2010, the Defendant has brought three different sets of proceedings in the High Court of England and Wales making substantially the same claims arising out of substantially the same factual allegations.

On 9 November 2018, the Defendant obtained a judgment in default against the Claimants in respect of the proceedings issued on 8 March 2016 (the 2016 Proceedings) in the sum of USD 6,520,190, plus interest in the sum of USD 8,466,600.69 and costs in the sum of £13,950 (the Default Judgment).

The Claimants claim is for: i) an order that the Default Judgment be set aside on the grounds that it was procured by fraud as there was conscious and deliberate dishonesty on the part of the Defendant in relation to: (a) the statements made in support of the 2016 Proceedings and/or (b) the evidence given in support of the application for a default judgment, which dishonest conduct was an operative cause of the decision by the court to enter the Default Judgment; ii) a declaration that, by commencing and continuing with the claim against the Claimants under claim no. QB-2019-001682, the Defendant is acting with conscious and deliberate dishonesty; iii) costs (iv) further or other relief.

Particulars of claim attached.

Bryan Cave Leighton Paisner LLP
Governor's House
5 Laurence Pountney Hill
London
EC4R 0BR

DX 92 LONDON

Claimant's or legal representative's address to which documents or payments should be sent if different from overleaf including (if appropriate) details of DX, fax or e-mail.

## Statement of truth

I understand that proceedings for contempt of court may be brought against a person who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

☐ **I believe** that the facts stated in this claim form and any attached sheets are true.

☑ **The Claimant** believes that the facts stated in this claim form and any attached sheets are true. **I am authorised** by the claimant to sign this statement.

**Signature**



☐ Claimant
☐ Litigation friend (where claimant is a child or protected party)
☑ Claimant's legal representative (as defined by CPR 2.3(1))

**Date**

| Day | Month | Year |
|-----|-------|------|
| 2  2 | 0  7 | 2  0  2  4 |

Full name

| Segun Osuntokun |
|---|

Name of claimant's legal representative's firm

| Bryan Cave Leighton Paisner LLP |
|---|

If signing on behalf of firm or company give position or office held

| Partner |
|---|

Find out how HM Courts and Tribunals Service uses personal information you give them when you fill in a form: https://www.gov.uk/government/organisations/hm-courts-and-tribunals-service/about/personal-information-charter

IN THE HIGH COURT OF JUSTICE                    **Claim No.** CL-2024-000452

BUSINESS AND PROPERTY COURTS

OF ENGLAND AND WALES

COMMERCIAL COURT (KBD)

BETWEEN:

### (1) FEDERAL GOVERNMENT OF NIGERIA
### (2) ATTORNEY GENERAL OF THE FEDERAL GOVERNMENT OF NIGERIA

<u>**Claimant**</u>

**– and –**

### LOUIS EMOVBIRA WILLIAMS

<u>**Defendant**</u>

---

## PARTICULARS OF CLAIM

---

### A.    INTRODUCTION

1.   The Defendant ("***Dr Williams***") is a Nigerian who has been resident in England since around 1979 and who claims to be a Nigerian qualified barrister.

2.   Since 2010, Dr Williams has brought three different sets of proceedings in the High Court of England and Wales making substantially the same claims arising out of substantially the same factual allegations:

2.1   First, on 10 March 2010 he brought a claim against the Central Bank of Nigeria ("***the CBN***"), which proceedings he discontinued on 26 February 2016, shortly before trial ("***the 2010 Proceedings***" – see Section B (paragraphs 6-28) below);

2.2   On 8 March 2016, within days of discontinuing the 2010 Proceedings, he commenced new proceedings, this time against the Claimants in these proceedings ("***the FGN***" and "***the Attorney General***" respectively); and – as set out at paragraph 4 below – he

1

obtained a default judgment in those proceedings on 9 November 2018 ("***the 2016 Proceedings***" – see Section C (paragraphs 29-33) below);

2.3    Then, on 9 May 2019, he commenced a further set of proceedings, again against the FGN and the Attorney General, which proceedings are still ongoing ("***the 2019 Proceedings***" – see Section H (paragraphs 47-51) below).

3.    In broad summary, Dr Williams alleges as follows:

3.1    Dr Williams claims to have been the victim of an undercover 'sting operation' carried out by the Nigerian State Security Service ("***the SSS***") in 1986 the purpose of which was to uncover breaches of the Exchange Control (Anti-Sabotage) Decree of 1984 then in force in Nigeria.

3.2    The sting operation was alleged to have arisen out of a complicated transaction involving the importation of foodstuffs to Nigeria by Dr Williams' client, Pearl Konsults Limited ("***PKL***"), with the intention that the proceeds of sale be used by PKL to purchase coal in Nigeria which would then be exported to Italy, with the proceeds of sale being used to repay the PKL Loan (as defined in paragraph 3.3 below) ("***the alleged 1986 Transaction***").

3.3    Dr Williams says that, as part of the alleged 1986 Transaction, he personally guaranteed a loan obtained by PKL from its bankers, Handelskrediet Kantoor AG ("***HKK***" / "***the PKL Loan***" / "***the Personal Guarantee***"), which guarantee he says was secured by bankers drafts which he provided and drawn on his bank, Trade Development Bank ("***TDB***").

3.4    As part of the alleged sting operation, Dr Williams alleges that the sum of Naira 30 million standing to the credit of PKL's bank account in Nigeria was frozen resulting in PKL not being able to repay the PKL Loan.  As a consequence, he alleges that the Personal Guarantee was called on by HKK, as a result of which he claims to have lost USD 6,520,190 of his own monies in England ("***the USD Monies***").  He further alleges that other monies belonging to him and held in Naira in various bank accounts in Nigeria were also confiscated in the total sum of Naira 5,013,316.29 ("***the Naira Monies***").

3.5    Dr Williams alleges that several years later, in September 1993, the alleged military President and Commander-in-Chief of Nigeria, General Babangida, ordered the CBN

to pay him: (i) the sum of USD 6,520,190; and (ii) the sum of USD 5,880,611 (being the USD equivalent of the Naira Monies), plus compound interest on both sums at a rate of 17.5%. The order requiring the CBN to pay those sums to Dr Williams is alleged to have been contained in a Presidential decree dated 29 September 1993 ("***the Fidelity Guarantee***"), which decree was allegedly signed by a Mr Dan Jafaru, allegedly the Principal Staff Officer, on behalf of General Babangida, and allegedly countersigned by the then Governor of the CBN, Mr Abdulkadir Ahmed.

4.  As set out at paragraph 33 below, by an order of the Honourable Mrs Justice Moulder dated 9 November 2018, Dr Williams obtained a judgment in default against the Claimants in the 2016 Proceedings in the sum of USD 6,520,190, plus interest in the sum of USD 8,466,600.69 and costs in the sum of £13,950 ("***the Default Judgment***").

5.  By these proceedings, the Claimants seek an order that the Default Judgment be set aside on the grounds that it was procured by fraud. As more fully particularised below, it is the Claimants' case that there was conscious and deliberate dishonesty on the part of Dr Williams in relation to: (i) the statements made in support of the claim and/or (ii) the evidence given in support of the application for a default judgment, which dishonest conduct was an operative cause of the court's decision to enter the Default Judgment.

## B.  THE 2010 PROCEEDINGS

6.  The 2010 Proceedings were brought against the CBN in the Queen's Bench Division under Claim No. HQ10X00931.

### (1)  The claims as originally brought

7.  As originally brought, Dr Williams put his case against the CBN in three ways:

    7.1  First, he alleged that the underlying sting operation gave rise to a claim against the CBN based on its alleged dishonest assistance in an alleged breach of trust and knowing receipt of trust monies ("***the 1986 Trust Claim***").

    7.2  Secondly, he alleged that the CBN had failed to comply with a purported Presidential directive dated 14 September 1993 by which the CBN had allegedly been ordered to pay monies to him ("***the Presidential Directive***"). In reliance upon the Presidential Directive, Dr Williams alleged that the CBN held monies on trust for him and that, in breach of trust, it had failed to pay those monies to him ("***the Original 1993 Trust***

*Claim*").   Dr Williams did not at that stage rely on the Fidelity Guarantee referred to at paragraph 3.5 above.

7.3    Thirdly, he alleged that in 2009 an agreement to return his monies to him had been reached with the then President, Umaru Yar-Adua, acting on behalf of the CBN ("*the 2009 Agreement*").

8.    The CBN applied to set aside the order of Master Yoxall granting Dr Williams permission to serve the claim out of the jurisdiction.  A hearing took place before the Honourable Mr Justice Supperstone in March 2011.  By a judgment dated 8 April 2011 ("*the Supperstone Judgment*"), the learned judge held (in summary) as follows:

8.1    That there was a serious issue to be tried in relation to the 1986 Trust Claim, it being arguable that (contrary to the submissions made on behalf of the CBN) the claim was not time barred.

8.2    That there was no serious issue to be tried in relation to the  Original 1993 Trust Claim because, even if the Presidential Directive was authentic (which the CBN did not accept), that directive was merely an instruction to the CBN to pay money to Dr Williams, and there was no evidence that a trust existed over any particular fund of monies.

8.3    That there was no serious issue to be tried in respect of the 2009 Agreement because there was no evidence that any alleged agreement had been entered into on behalf of the CBN.

## (2)    Alleged discovery of the Fidelity Guarantee and the new Nigerian Law Claim

9.    In May 2011, following the handing down of the Supperstone Judgment, Dr Williams claimed to have discovered the Fidelity Guarantee.  The Fidelity Guarantee purported to have been issued on the orders of President Babangida, the purported military President and Commander-in-Chief of Nigeria.

10.    Dr Williams claimed that the Fidelity Guarantee had been found amongst the state papers of the former Attorney General of Nigeria, a Mr Clement Akpamgbo, which papers (although being official, state papers) had allegedly been stored in Lagos in the private offices of a Nigerian lawyer, a Mr Ohi Pogoson, until their discovery in May 2011.

11.   On the strength of the Fidelity Guarantee, Dr Williams applied to amend his claim to bring various additional claims, including an alternative trust claim ("***the Alternative 1993 Trust Claim***") and a claim to enforce the Fidelity Guarantee directly under Nigerian law ("***the Nigerian Law Claim***").

12.   The CBN did not accept the authenticity of the Fidelity Guarantee, but accepted that there was a serious issue to be tried on that issue and so did not dispute its authenticity for the purposes of Dr Williams' application for permission to amend.

13.   A hearing took place on 12 January 2012 before the Honourable Mr Justice Beatson and judgment was handed down on 24 January 2012 ("***the Beatson Judgment***").  By an order dated 24 January 2012, Beatson J. gave Dr Williams permission to bring the Nigerian Law Claim (but not the Alternative 1993 Trust Claim) and to serve the amended claim outside the jurisdiction.

14.   However, the permission granted by Beatson J. was expressly limited to the part of the Nigerian Law Claim relating to the USD Monies, i.e. not the part of the claim relating to the Naira Monies, because (at that stage) there was no evidence that the Naira Monies (or their USD equivalent) were being held within the jurisdiction, and so none of the jurisdictional gateways applied to that part of the claim.[1]  Accordingly, as a condition of being granted permission to serve out, Dr Williams was required to undertake to the court not to pursue the Nigerian Law Claim in respect of the Naira Monies.

**(3)    The alleged Progress Report**

15.   Dr Williams appealed against the order of Beatson J. refusing him permission to bring the Alternative 1993 Trust Claim.  In support of his appeal, he relied on a document purporting to be a progress report sent by the Governor of the CBN to the President on 17 October 1993 ("***the Progress Report***").

16.   Dr Williams claimed to have discovered the Progress Report in March 2012 after Beatson J. had handed down his judgment.  The Progress Report purported to record that the CBN was holding the USD equivalent of the Naira Monies in an identified bank account in London.

---

[1]    In relation to the USD Monies, those monies had allegedly been lost in England and so Dr Williams was able to establish jurisdiction in respect of those monies.

17. The CBN did not accept the authenticity of the Progress Report, but accepted that there was a serious issue to be tried on that issue, and so did not dispute its authenticity for the purposes of Dr Williams' appeal.

18. The appeal in relation to the Alternative 1993 Trust Claim was unsuccessful. However, on the strength of the Progress Report, Dr Williams was able to argue that, contrary to the position as it stood before Beatson J. (see paragraph 14 above), there <u>was</u> now evidence that the Naira Monies (or their USD equivalent) had (at least as at the date of the alleged Progress Report) been located within the jurisdiction.

19. Accordingly, on the strength of the Progress Report, the Court of Appeal released Dr Williams from the undertaking referred to at paragraph 14 above, with the result that Dr Williams had permission to serve both aspects of the Nigerian Law Claim on the CBN outside the jurisdiction, i.e. the claim in respect of both the USD Monies and the Naira Monies.

### (4)    The alleged Proclamation

20. In June 2011, following the handing down of the Supperstone Judgment, the solicitors acting on behalf of CBN wrote to Dr Williams explaining why the CBN did not accept the authenticity of the Fidelity Guarantee. It was pointed out to Dr Williams (inter alia) that, although the Fidelity Guarantee was purportedly issued on 29 September 1993 on the orders of General Babangida, the alleged military President and Commander-in-Chief of Nigeria, there was - in fact - no military government in power in Nigeria at that time.

21. As explained by the CBN's solicitors in correspondence, the true position is as follows:

21.1 On 26 August 1993 executive powers were transferred from the existing Armed Forces Ruling Council ("*AFRC*") headed by General Babangida, to a civilian government known as the Interim National Government ("*ING*").

21.2 The transfer of power was effected pursuant to the terms of the <u>Interim Government (Basic Constitutional Provisions) Decree 1993 (Decree No 61)</u> dated 26 August 1993 ("*the ING Decree*").

21.3 The ING Decree created an indivisible and indissoluble sovereign state to be known by the name of the Federal Republic of Nigeria. The ING Decree expressly provided that "*the Federal Republic of Nigeria was not to be governed except in accordance with its provisions*".

6

21.4 The ING Decree established a National Assembly vested with legislative powers (in place of the AFRC), and a Head of the Interim Government vested with executive powers. A civilian by the name of Chief Ernest Shonekan was duly sworn in as the Head of the Interim Government on 26 August 1993 and on 7 October 1993 Mr Shonekan addressed the General Assembly of the United Nations in New York in his capacity as head of state.

21.5 Although the civilian government was short-lived (there was a military coup in November 1993 under which General Abacha came to power and reinstated the military regime), there was no military President as at the date of the purported Fidelity Guarantee; and General Babangida (on whose orders the decree was allegedly issued) did not have authority to issue any executive orders at that time.

22. It was not until March 2014—almost three years after the CBN had disputed the authenticity of the Fidelity Guarantee—that Dr Williams sought to rely on a purported Proclamation alleged to have been issued by the AFRC on 25 August 1993 ("*the Proclamation*"). The Proclamation purported to record that General Babangida was to continue to have executive powers notwithstanding the installation of a civilian government and notwithstanding the express terms of the ING Decree (e.g. as set out at paragraph 21.3 above).

23. It was only by relying upon the Proclamation that Dr Williams was able to maintain that (assuming the Fidelity Guarantee was genuine, which the CBN denied) General Babangida had lawful authority to order the CBN to pay monies to Dr Williams. Otherwise, any authority General Babangida may have had to issue orders to the CBN had lapsed upon the installation of the civilian government and the enactment of the ING decree.

### (5)    CBN's appeal in relation to the 1986 Trust Claim

24. The CBN maintained that the 1986 Trust Claim was time barred (see paragraph 8.1 above) and appealed against the order of Supperstone J. in that regard.

25. Following a hearing before the Supreme Court on 4 and 5 November 2013, the Supreme Court held (overturning an earlier order of the Court of Appeal dated 3 April 2012) that there was no serious issue to be tried in respect of the 1986 Trust Claim because, as contended for by the CBN, the claim was time barred under section 21(1)(a) of the Limitation Act 1980.

26. As a result of the Supreme Court's decision, Dr Williams' only remaining claim against the CBN was the Nigerian Law Claim, which claim was founded upon the Fidelity Guarantee. Accordingly:

26.1 Issues such as whether the alleged 1986 Transaction had taken place, whether Dr Williams had given the Personal Guarantee, and whether Dr William had lost USD 6,520,190 of his own monies, did not arise for determination in those proceedings;

26.2 The only issue between Dr Williams and the CBN was whether the purported Fidelity Guarantee was: (a) authentic; and (b) a valid and effective executive order under Nigerian law, issues which (in turn) depended in part on the authenticity and legal effect of the purported Proclamation.

**(6)    Subsequent events: discontinuance of claim**

27. The CBN's position, supported by factual and expert evidence, was that the Fidelity Guarantee, the Proclamation, the Progress Report, as well as various other documents relied on by Dr Williams (including, for example, the Presidential Directive), were fabricated documents which had been dishonestly created by or on his behalf to support a dishonest claim.

28. The trial in relation to the Nigerian Law Claim was due to commence on or around 29 February 2016.  However, by a Notice of Discontinuance dated 26 February 2016, Dr Williams (without any prior warning) discontinued the claim.

**C.    THE 2016 PROCEEDINGS**

29. On 8 March 2016, within a matter of days of discontinuing the 2010 Proceedings against the CBN, Dr Williams commenced the 2016 Proceedings against the FGN and the Attorney General in the Queen's Bench Division, Commercial Court, under Claim No. CL-2016-000151.

30. The claim was advanced on two alternative bases:

30.1 First, a claim in the sum of USD 6,520,190 plus interest which was substantially the same claim as the 1986 Trust Claim, albeit against the FGN and the Attorney General rather than the CBN; and

30.2 Secondly, and in the alternative, a claim for the sums of USD 6,520,190 and USD 5,880,611, plus compound interest, which was substantially the same claim as the

Nigerian Law Claim, albeit against the FGN and the Attorney General rather than the CBN.

31.  The Claim Form and Particulars of Claim in the 2016 Proceedings were both supported by a Statement of Truth signed by Dr Williams and the Claimants will rely at trial on those documents for their true meaning and effect.  Without prejudice to the foregoing:

31.1  At paragraph 5 of the Particulars of Claim, Dr Williams referred to the Personal Guarantee he had allegedly been asked to provide by PKL in respect of the alleged PKL Loan.

31.2  At paragraph 6(1), he alleged that that he agreed to provide PKL's bank with a personal guarantee in respect of the alleged PKL Loan.

31.3  At paragraph 7, he alleged that Naira 30 million paid into PKL's bank account in Nigeria (to pay for the foodstuffs imported into Nigeria) were supposed to be released to PKL, that those monies were supposed to be used to purchase coal in Nigeria and exported to Italy, and that the proceeds of the sale of coal were supposed to be used to repay the PKL Loan.  It was further alleged that, on repayment of the loan, it was intended that Dr Williams' guarantee would be discharged.

31.4  At paragraph 9(2), he alleged that he gave a personal guarantee in respect of the PKL Loan, which guarantee was secured by the provision by Dr Williams to HKK of bankers drafts issued by his bank, TDB.

31.5  At paragraphs 19-21, he alleged that, pursuant to the alleged sting operation, the N 30 million in PKL's bank account at the United Bank of Africa ("*UBA*") was frozen, and the monies which PKL had borrowed and which were being held in England were paid away in breach of trust by a solicitor, Mr Reuben Gale; as a result of which HKK enforced the Personal Guarantee and he (Dr Williams) lost USD 6,520,190 of his own monies.

31.6  At paragraph 36 of the Particulars of Claim, Dr Williams alleged that on 29 September 1993, the President promulgated a decree, i.e. the Fidelity Guarantee, and at paragraph 37 he alleged that the Fidelity Guarantee had been signed by the then Governor of the CBN.

31.7   At paragraph 42, Dr Williams alleged that the FGN had failed to pay the monies due to him under the Fidelity Guarantee and failed to procure payment by the CBN in accordance with the Fidelity Guarantee.

32.   On 24 January 2018, in default of an acknowledgment of service, Dr Williams applied for a judgment in default.  In support of that application, Dr Williams relied on two affidavits, one dated 22 January 2018 ("***the First Affidavit***"), the other dated 5 November 2018 ("***the Second Affidavit***"; and together "***the Affidavits***").  The Claimants will rely at trial on the full versions of the Affidavits for their true meaning and effect, but without prejudice thereto:

32.1   In both Affidavits Dr Williams expressly referred to and relied on the facts and matters set out in the Particulars of Claim.

32.2   At paragraph 3 of the First Affidavit, Dr Williams referred to paragraphs 4-22 of the Particulars of Claim and alleged that the sum of USD 6,520,920 belonging to him had been paid away by a Mr Reuben Gale.

32.3   At paragraph 7 of the First Affidavit, Dr Williams referred to and relied on the Progress Report and he exhibited a copy of the alleged report to his affidavit, thereby representing that the document exhibited was a true copy of a genuine document.

32.4   At paragraphs 10 and 11 of the Second Affidavit, Dr Williams referred to and relied on the content of the First Affidavit and the Particulars of Claim and repeated the allegation that, as a result of the alleged sting operation, he had lost USD 6,520,090 of his own monies.

32.5   At paragraph 12 of the Second Affidavit, Dr Williams referred to the Fidelity Guarantee, a copy of which was exhibited to the affidavit, thereby representing that the document exhibited was a true copy of a genuine document.

33.   The hearing of Dr Williams' application for a judgment in default took place on 9 November 2018 before the Honourable Mrs Justice Moulder, at which hearing Dr Williams was represented by counsel and the Claimants did not appear and were not represented.  In support of the application, Dr Williams relied on (inter alia) the Particulars of Claim and both of the Affidavits (and the documents exhibited thereto).  At the hearing:

10

33.1 The learned judge refused to grant judgment in default in respect of the Nigerian Law Claim on the grounds that the claim was covered by state immunity under section 2 of the State Immunity Act 1978.

33.2 However, she granted a default judgment in respect of the 1986 Trust Claim and ordered the Claimants to pay the principal sum of USD 6,520,190, plus interest in the sum of USD 8,466,600.69 and costs in the sum of £13,950 ("*the Default Judgment*").

## D.    THE REPRESENTATIONS

34. Pursuant to the statements set out in the Particulars of Claim and the Affidavits (and the documents exhibits thereto), as set out at paragraphs 31 and 32 above, Dr Williams made the following representations in support of his claim and relied on those representations in support of the application for the Default Judgment:

34.1 In relation to the alleged 1986 Transaction, he represented that:

(a) he gave the Personal Guarantee in respect of PKL's alleged loan from its bankers, HKK;

(b) the Personal Guarantee was secured in the form of bankers drafts drawn on his Bank, TDB, which bankers drafts he provided to HKK as security; and

(c) the Personal Guarantee was subsequently enforced by HKK, as a result of which Dr Williams lost USD 6,520,190 of his own monies;

(together, "*the Personal Guarantee Representations*");

34.2 In relation to the Progress Report, he represented that:

(a) the letter dated 17 October 1993 which was exhibited to his First Affidavit was a true copy of a genuine letter written by the then Governor of the CBN, Mr Paul Ogwuma, to the then Commander-in-Chief; and

(b) the signature which appeared on the document was a genuine signature of Mr Ogwuma;

(together, "*the Progress Report Representations*");

34.3 In relation to the Fidelity Guarantee, he represented that:

(a)    the Fidelity Guarantee on which he relied (and which was exhibited to his Second Affidavit) was a true copy of a genuine Presidential decree issued by the then Commander-in-Chief of the Nigerian Armed Forces, General Babangida, on 29 September 1993; and

(b)    the Fidelity Guarantee was (i) signed by a Mr Jafaru, allegedly the Principal Staff Officer with the military rank of Colonel, on behalf of General Babangida; and (ii) countersigned by the then Governor of the CBN, Mr Abdulkadir Ahmed;

(together, "*the Fidelity Guarantee Representations*").

## E.    FABRICATED DOCUMENTS

35.    As set out at paragraphs 37-39 below, it is averred that each of (1) the Proclamation, (2) the Progress Report and (3) the Fidelity Guarantee are fabricated documents, dishonestly created by or on behalf of Dr Williams for the purposes of misleading the Court and pursuing dishonest claims.

36.    The Claimants do not accept the authenticity of several other documents relied on by Dr Williams in support of his claims, but it is not necessary for the Claimants to prove that other documents relied on by him are fabricated for the purposes of these proceedings.

## (1)    The Proclamation

37.    In support of their case that the Proclamation is fabricated, the Claimants will rely on the following facts and matters:

37.1    For the reasons set out at paragraph 21 above, Dr Williams needed to come up with an explanation as to how General Babangida was able to issue an executive order given that the military government was not in force at the time the Fidelity Guarantee was purportedly issued.  Dr Williams therefore had a motive for creating a fictitious document purporting to confirm General Babangida's authority to issue executive orders notwithstanding the installation of a civilian government—hence the Proclamation, without which the Nigerian Law Claim was bound to fail.

37.2    The Proclamation relied on by Dr Williams was not gazetted, no mention of it has been found in any official record or archive, and there are no contemporaneous documents recording or evidencing its existence.  Nor did Dr Williams have a proper

12

explanation in the 2010 Proceedings as to where the Proclamation had been found or how it had come into his possession.

37.3 The Proclamation contains historical and factual inaccuracies. In particular, the Proclamation was purportedly issued by the "*Office of the Presidency, Dodan Barracks, Lagos*" and it was purportedly signed by Vice-Admiral Aikhomu in his capacity as "*Chief of General Staff*", whereas:

(a) During General Babangida's time in power, official documents were never described as emanating from the "*Office of the Presidency*";

(b) The seat of the Nigerian Government moved in 1991 from Dodan Barracks in Lagos to Aso Rock Villa in Abjuja;

(c) The Vice-Admiral was not titled or known as 'Chief of General Staff' after 1986; rather, he was titled and known as the Vice-President of the Federal Republic of Nigeria.

37.4 Despite having been allegedly issued in 1993, the Proclamation is written in a font known as 'Cambria', a font produced by Microsoft which was not publicly available until 2007.

37.5 The Proclamation contains basic spelling mistakes (e.g. 'Nigera' instead of 'Nigeria' and 'Babaginda' instead of 'Babangida'). It is inherently unlikely that an instrument of such constitutional importance as the Proclamation would have contained such basic errors. Similarly, the Proclamation contains inappropriate Latin phrases, which (it is to be inferred) were used to give the false appearance of it being a formal, legal instrument.

37.6 The signature on the final page of Mr Augustus Aikhomu, the purported 'General Chief of Staff' contains irregular characteristics (laboured angular pen movements containing a mixture of light and fluent pen movements and heavy pen pressure) which is not consistent with a normal and natural signature. It is to be inferred that the signature is fabricated, designed to give the false impression of it being someone's genuine signature.

37.7 The spacing of the emblems on the letterhead is not symmetrical and, it is to be inferred, the emblems were physically 'cut and paste' from another document and

then photocopied onto another document to give the appearance of an official letterhead.

37.8    There are internal inconsistencies in the formatting of dates (e.g. "*25TH August, 1993*" on the covering page and "*August 25th 1993*" in paragraph 1), which is inconsistent with it being an official document.  Likewise, there are errors and inconsistencies in the numbering and punctuation (e.g. in numbered paragraph 7 of the document).  Further, the spacing and alignment of the numbered paragraphs is irregular.  All of these features are inconsistent with the document having been prepared by a professional typist or checked by any state official.

37.9    Further, the Claimants will rely on the Progress Report and the Fidelity Guarantee (both of which are fabricated) as evidence of a propensity on the part of Dr Williams to rely on fabricated and dishonest evidence, thereby supporting their case that the Proclamation was fabricated.

## (2)    The Progress Report

38.    In support of their case that the Progress Report is fabricated, the Claimants will rely on the following facts and matters:

38.1    Dr Williams needed evidence that the Naira Monies (or their USD equivalent) were located within the jurisdiction: the absence of such evidence meant that he had not been permitted by Beatson J. to pursue the Nigerian Law Claim in respect of the Naira Monies (or their USD equivalent).  Paragraphs 13-18 above are repeated.  Dr Williams therefore had a motive for fabricating the Progress Report which document purported to evidence that the Naira Monies (or their USD equivalent) had at the time of the report been located within the jurisdiction, as a result of which evidence Dr Williams secured a release from the undertaking referred to at paragraph 14 above.

38.2    The circumstances in which Dr Williams claimed to have discovered the Progress Report, and the timing of its alleged discovery in April 2012 (only after the Beatson Judgment had been handed down), are highly suspicious and are not credible:

(a)    Dr Williams claimed to have first obtained a copy of the Progress report in April 2012, shortly after the Beatson Judgment was handed down refusing him permission to bring the Nigerian Law Claim in respect of the Naira monies.

14

(b)    Dr Williams claimed to have obtained a copy of the Progress Report from a Mr Emenike Mgbemena, allegedly a practising barrister and solicitor in Nigeria, as well as a solicitor of England and Wales.

(c)    The copy of the Progress Report was alleged to have been found amongst the papers of the former Attorney General, Mr Akpamgbo.  However, rather than it being found in the private offices of Mr Pogoson in Lagos (which is where the Fidelity Guarantee was allegedly discovered), it was allegedly discovered in a private property in London.

(d)    Dr Williams alleged that Mr Mgbemena had been instructed in 2005 to sell Mr Akpamgbo's property in London.  The conveyancing was alleged to have been carried out by Mr Mgbemena's wife, alleged to be an English solicitor, and the sale is said to have completed in August 2005.

(e)    Dr Williams alleged that Mr Mgbemena had been responsible for clearing the property after it was sold and that, whilst doing so, he discovered a number of Mr Akpamgbo's old files, including one entitled "*Re Dr L. E. Williams*".

(f)    That file (which contained the Progress Report) was alleged not to have been discovered until April 2012.  That was despite the fact that, on Dr Williams' case, Mr Mgbemena was alleged to have been involved in the earlier negotiations with the President in 2008/9 concerning the return of his monies.

(g)    There is no or no proper explanation as to (i) why Mr Akpamgo's official, state papers, had been kept in storage in a private property in London, (ii) why the file had not been provided to Dr Williams prior to 2012 (given that it had allegedly been found by Mr Mgbemena in 2005), and/or (iii) the circumstances in which Mr Mgbemena allegedly came to contact Dr Williams in April 2012 to inform him about the existence of the alleged file.

38.3   The signature on the Progress Report of the then Governor of the CBN, Mr Paul Ogwuma, is a forgery.  The forged signature was created (at least in part) by copying the genuine signature of Mr Ogwumu which appeared on Nigerian bank notes which were in circulation at the time that Mr Ogwumu was the Governor of the CBN.

38.4   Further, the Claimants will rely on the Proclamation and the Fidelity Guarantee (both of which were fabricated) as evidence of a propensity on the part of Dr Williams to

rely on fabricated and dishonest evidence, thereby supporting their case that the Progress Report was itself fabricated.

### (3)   The Fidelity Guarantee

39. In support of their case that the Fidelity Guarantee is fabricated, the Claimants will rely on the following facts and matters:

39.1 Dr Williams had a motive for fabricating the Fidelity Guarantee in light of Supperstone J.'s decision in April 2011 that there was no serious issue to be tried in respect of the Original 1993 Trust Claim. The Fidelity Guarantee purported to answer the learned judge's reasons for rejecting that claim and gave him a basis for pursuing an alternative trust claim (albeit that permission was not granted in respect of that claim). Paragraphs 8.2 and 11-14 above are repeated.

39.2 The circumstances in which Dr Williams claimed to have discovered the Fidelity Guarantee, and the timing of its alleged discovery in May 2011 (only after the Supperstone Judgment had been handed down), are highly suspicious and are not credible:

(a) At the hearing before Supperstone J. in March 2011, Dr Williams had relied on a number of documents allegedly created in 1993, including the Presidential Directive dated 14 September 1993 referred to at paragraph 7.2 above. However, Dr Williams claimed to have been given a copy of the Fidelity Guarantee only after the Supperstone Judgment had been handed down.

(b) The copy of the Fidelity Guarantee was said to have been found amongst the state papers of the former Attorney General, Mr Akpamgbo, which papers were allegedly being kept in the private offices of a Nigerian lawyer, Mr Ohi Pogoson, in Lagos.

(c) There is no proper explanation as to why those official, state papers were being held in the private offices of Mr Pogoson. Nor is there a proper explanation as to how the papers came to be discovered in May 2011, or why the Fidelity Guarantee had not been discovered before then.

39.3 The Fidelity Guarantee contains extraordinary terms, including as to what would happen in the event that the CBN refused to comply with the Presidential order (e.g. the waiver by the CBN of defences based on limitation or state immunity). The

16

Fidelity Guarantee was also purportedly governed by English law, not Nigerian law. On the assumption that the Fidelity Guarantee was genuine, there is no reason to believe that the CBN (whose Governor had allegedly accepted its terms by signing it) would not comply with the Presidential order; and there would therefore have been no reason for those clauses to be included.  It is to be inferred that those terms were included in an attempt by Dr Williams to answer the jurisdictional and limitation defences which the CBN had already raised before Supperstone J.

39.4   The Fidelity Guarantee was not gazetted or made public in any other way. Despite extensive searches, neither the CBN nor the FGN nor the Attorney General has been able to find a copy of the Fidelity Guarantee or any contemporaneous document evidencing its existence.

39.5   Despite being purportedly issued by the military President, General Babangida, there was in fact not no military President in power at the time the Fidelity Guarantee was purportedly issued.  Paragraph 21 above is repeated.

39.6   The Fidelity Guarantee contains the same historical and factual inaccuracies set out at paragraph 37.3 above.  Further, the Fidelity Guarantee bears a version of the Nigerian coat of arms which did not exist after 1979.  The motto on the official coat of arms of Nigeria until 1979 was "*Unity and Faith*" (which is what appears on the coat of arms on the Fidelity Guarantee), but the motto then changed to "*Unity and Faith, Peace and Progress*".

39.7   The signature on the Fidelity Guarantee purporting to be that of Mr Ahmed, the then Governor of the CBN is a forgery.  Like the forged signature of Mr Ogwuma on the Progress Report (see paragraph 38.3 above), the forged signature on the Fidelity Guarantee was created (at least in part) by copying the genuine signature of Mr Ahmed which appeared on Nigerian bank notes in circulation at the time that Mr Ahmed was the Governor of the CBN.

39.8   The Fidelity Guarantee purports to bear the official stamp of the CBN, but the stamp is a forgery.  The acronym "CBN" was not used on the CBN's official documents or stamps at the material time (or indeed any time thereafter).

39.9   The Fidelity Guarantee was purportedly signed on behalf of General Babangida and Vice-Admiral Aikhomu by a Mr Dan Mohammed Jafaru, allegedly the Principal Staff Officer with the military rank of Colonel.  In support of the 2010 Proceedings, Dr

17

Williams filed a witness statement purportedly signed by Mr Jafaru dated 25 March 2013 and purporting to confirm that he had signed the Fidelity Guarantee on behalf of General Babangida in his capacity as the Principal Staff Officer with the military rank of Colonel. Dr Williams claimed that Mr Jafaru had died since signing the witness statement and he sought to rely on it as hearsay evidence, but the CBN made enquiries of military records and could not find any trace of the alleged Mr Jafaru. The Claimants aver (as the CBN did in the 2010 Proceedings) that no such person holding that position or military rank ever existed and/or signed the Fidelity Guarantee; rather, such a person was invented for the purposes of bolstering Dr Williams' claim.

39.10 Further, the Claimants will rely on the Proclamation and the Progress Report (both of which were fabricated) as evidence of a propensity on the part of Dr Williams to rely on fabricated and dishonest evidence, thereby supporting their case that the Fidelity Guarantee was fabricated.

## F.    FALSITY OF THE REPRESENTATIONS

40. The Fidelity Guarantee Representations (or either of them) were false because (as Dr Williams knew) the Fidelity Agreement was a fabricated document dishonestly created by or on behalf of Dr Williams, which document had not been signed by Mr Jafaru on behalf of General Babangida or countersigned by Mr Ahmed on behalf of the CBN. Paragraph 37 above is repeated.

41. The Progress Report Representations (or either of them) were false because (as Dr Williams knew) the Progress Report was a fabricated document dishonestly created by or on behalf of Dr Williams, which document had not been countersigned by Mr Ogwuma on behalf of the CBN. Paragraph 38 above is repeated.

42. In relation to the Personal Guarantee Representations, those representations (or any of them) were false because, as Dr Williams knew:

42.1 Dr Williams did not give the alleged Personal Guarantee in respect of the alleged PKL Loan;

42.2 The alleged Personal Guarantee (the existence of which is denied) was not secured by any bankers drafts provided by Dr Williams and drawn on his bank, TDB; and

42.3 Dr Williams did not lose USD 6,520,190 of his own monies as part of the alleged 1986 Transaction.

18

43. In support of the facts and matters pleaded at paragraph 42 above, the Claimants rely on the following facts and matters:

43.1 Dr Williams has not produced a copy of the alleged loan from HKK to PKL or any contemporaneous evidence directly evidencing the existence of the alleged loan.

43.2 Dr Williams has not produced a copy of the Personal Guarantee or any contemporaneous evidence directly evidencing its existence.

43.3 Dr Williams has not produced a copy of the alleged bankers drafts drawn on TDB allegedly provided by way of security in respect of the (alleged) Personal Guarantee or any contemporaneous evidence directly evidencing the existence of such bankers drafts.

43.4 Dr Williams has not produced any contemporaneous evidence directly evidencing the allegation that HKK enforced the (alleged) Personal Guarantee or any contemporaneous evidence directly evidencing that it did so.

43.5 Dr Williams has not produced any contemporaneous evidence directly evidencing the allegation that he lost USD 6,050,290 of his own monies.

43.6 Following the alleged 1986 Transaction, PKL and Dr Williams brought proceedings in the High Court of Lagos against the UBA, the CBN, the SSS and the Commissioner of Police.  In the Amended Statement of Claim in those proceedings, there was no allegation that Dr Williams had provided a personal guarantee in respect of the alleged PKL Loan, nor was there any allegation that Dr Williams had provided bankers drafts drawn on his bank as security for the loan or that the personal guarantee had been called on by HKK.

43.7 Further, the Claimants will rely on the falsity of the Fidelity Guarantee Representations and the Progress Report Representations, which representations were made fraudulently, as evidence of Dr Williams' propensity to make fraudulent representations in support of dishonest claims and in support of their case that the Personal Guarantee Representations were false and made fraudulently.

## G.    DEFAULT JUDGMENT: FRAUD ON THE COURT

44. There was conscious and deliberate dishonesty on the part of Dr Williams by making and relying on the Fidelity Guarantee Representations, the Progress Report Representations

sand/or the Personal Guarantee Representations, which representations (or any of them) were an operative cause of the decision by the court to enter the Default Judgment against the Claimants.

45.    Further, even if (contrary to the foregoing) there was no conscious and deliberate dishonesty on the part of Dr Williams in relation to the Personal Guarantee Representations, it is averred that Dr Williams' deliberate and dishonest conduct in relation to the Fidelity Guarantee Representations and/or the Progress Report Representations was nevertheless an operative cause of the court's decision to grant the Default Judgment notwithstanding that the Default Judgment was only granted in respect of the 1986 Trust Claim, not the Nigerian Law Claim.

46.    In the premises, the Claimants are entitled to and seek an order setting aside the Default Judgment on the grounds of fraud on the court.

## H.    THE 2019 PROCEEDINGS

47.    By a claim form issued on 9 May 2019, Dr Williams commenced a second set of proceedings in the Queen's Bench Division against the FGN and the Attorney General under claim no. QB-2019-001682.

48.    The Particulars of Claim relied on by Dr Williams in support of the 2019 Proceedings (signed by Dr Williams with a Statement of Truth) are substantially the same as the Particulars of Claim which he relied on in the 2016 Proceedings, save that the relief sought in the two sets of proceedings is different.  The 2019 Proceedings include claims in respect of both the 1986 Trust Claim and the Nigerian Law Claim.

49.    Accordingly, in support of the 2019 Proceedings, Dr Williams continues to make and rely on the Personal Guarantee Representations, the Progress Report Representations[2] and the Fidelity Guaranty Representations.

50.    The Particulars of Claim in the 2019 Proceedings make no mention of the existence of the 2016 Proceedings, the fact that the Moulder J. had already found that the Nigerian Law Claim was covered by state immunity (see paragraph 33.1 above), or the fact that the Default Judgment had already been obtained in respect of the 1986 Trust Claim.

---

[2]    Unlike the Particulars of Claim in the 2016 Proceedings, there is an express reference in the 2019 Proceedings to the Progress Report: see paragraph 31(5).

51.  In the premises, but without prejudice to any applications to be made in those proceedings, the Claimants seek a declaration that Dr Williams has acted and is continuing to act with deliberate and conscious dishonesty by commencing and/or pursuing the 2019 Proceedings.

## I.  RELIEF SOUGHT

AND THE CLAIMANTS CLAIM:

(1)  An order setting aside the Default Judgment on the grounds of fraud on the Court.

(2)  A declaration that, by commencing and continuing with the claim against the FGN and the Attorney General under claim no. QB-2019-001682, the Defendant has acted and is continuing to act with conscious and deliberate dishonesty.

(3)  Costs.

(4)  Further or other relief.

**EDWARD LEVEY KC**

July 2024

## STATEMENT OF TRUTH

The Claimants believes that the facts stated in these Particulars of Claim are true. The Claimants understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

Signed: *[signature] 18/07/24*

Name: LATEEF OLASUNKANMI FAGBEMI

Date: 18TH July, 2024

Position or office held: ATTORNEY GENERAL OF THE FEDERATION

21