Neutral Citation Number: [2025] EWHC 2217 (Comm)

Case No: CL-2024-000452

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**
**KING'S BENCH DIVISION**
**COMMERCIAL COURT**

Royal Courts of Justice
Rolls Building, Fetter Lane,
London, EC4A 1NL

Date: 26/08/2025

**Before** :

**THE HONOURABLE MR JUSTICE HENSHAW**

- - - - - - - - - - - - - - - - - - - - -

**Between:**

| | |
|---|---|
| **(1) FEDERAL GOVERNMENT OF NIGERIA** | **Claimants** |
| **(2) ATTORNEY GENERAL OF THE FEDERAL GOVERNMENT OF NIGERIA** | |
| **- and -** | |
| **LOUIS EMOVBIRA WILLIAMS** | **Defendant** |

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

**Edward Levey KC** (instructed by **Bryan Cave Leighton Paisner LLP**) for the **Claimants**
**Oluwole Ogunbiyi** (**Direct Access**) for the **Defendant**

Hearing date: 11 July 2025
Draft judgment circulated to parties: 31 July 2025

# Approved Judgment

This judgment was handed down remotely at 10.30am on [date] by circulation to the parties or their representatives by e-mail and by release to the National Archives.

.............................

**Mr Justice Henshaw:**

(A) INTRODUCTION ........ 1
(B) MAIN FACTS ........ 2
(C) PRINCIPLES ........ 3
(1) Power to grant an anti-enforcement injunction ........ 3
(2) Applicable test ........ 6
(D) APPLICATION ........ 7
(E) CONCLUSION ........ 8

## (A) INTRODUCTION

1. This case concerns a claim by the Federal Government of Nigeria ("***the FGN***") and the Attorney General of the Federal Government of Nigeria ("***the AG***") for the setting aside of a default judgment granted by Moulder J on 9 November 2018 in proceedings brought against them by the Defendant ("***Dr Williams***") in claim CL-2016-000151 ("***the 2016 Proceedings***") for US$14,986,791 (plus costs) ("***the Default Judgment***") on the ground that the judgment was obtained fraudulently.

2. By my substantive judgment dated 8 May 2025, I dismissed an application by Dr Williams for an order striking out the claim on the ground that it was an abuse of process.

3. After that judgment was handed down, I made an interim order on the papers on 17 June 2025, formally dismissing the application and giving directions for (a) service of a Defence by Dr Williams, (b) the filing of submissions in relation to costs and any other consequential matters and (c) the filing of evidence in response to, and the hearing of, an application issued by the Claimants on 2 June 2025 for an anti-enforcement injunction ("***AEI***"). Dr Williams on 23 June 2025 applied to set aside that interim order.

4. At a hearing on 11 July 2025, I made orders:

   i) dismissing Dr Williams' application to set aside the interim order dated 17 June 2025;

   ii) disposing of the costs of Dr Williams' application to strike out the claim;

   iii) refusing permission to appeal from my decision on the strike-out application;

   iv) providing for Dr Williams to be debarred from defending these proceedings without further order unless he files and serves his Defence by 4pm on 8 August 2025;

   v) dealing with the costs of the set-aside and 'unless' order applications; and

   vi) granting an AEI restraining Dr Williams, until the final determination of these proceedings or further order of the court, from taking any step(s) to pursue or

prosecute or progress his claim or seek relief (or any similar claim or relief) in proceedings which Dr Williams has commenced in the United States District Court for the Southern District of New York seeking recognition and enforcement of the Default Judgment.

5. It was not practicable at the hearing on 11 July 2025 to give more than very brief reasons for order (vi) above, the grant of the AEI, so I indicated that short written reasons would follow. This judgment sets out those reasons.

**(B) MAIN FACTS**

6. On 18 August 2023, Dr Williams commenced proceedings before the US District Court for the Southern District of New York ("***the New York Court***") seeking to have the Default Judgment recognised and to enforce it against the Claimants, the Central Bank of Nigeria ("***the CBN***"), JP Morgan Chase & Co and other unidentified Nigerian government entities and US banking entities holding Nigerian Government funds ("***the Enforcement Proceedings***").

7. The Claimants filed a Motion to Dismiss on 19 September 2023 (as amended on 6 October 2023) on the grounds that there was a lack of subject matter jurisdiction, relying on sovereign immunity. By a judgment of District Judge Lewis J Liman dated 12 August 2024, that motion was denied. Upon the dismissal of the motion, the Claimants filed their Answer to the Complaint on 26 August 2024. In summary, the Claimants (and the CBN) defend the Enforcement Proceedings relying on essentially the same allegations that are made by the Claimants in the present proceedings, i.e. that the underlying claim as presented by the Defendant to Moulder J, and on which the Default Judgment was based, was fundamentally dishonest and founded upon forged and fabricated documents, such that the judgment was obtained by fraud and should not be recognised or enforced. In addition, the CBN advances a separate defence pursuant to the US Foreign Sovereign Immunities Act.

8. On 28 August 2024, the Claimants appealed against the denial of their Motion to Dismiss. On 8 October 2024 the Enforcement Proceedings were stayed (save for limited discovery ordered to be provided by Dr Williams) pending the outcome of the appeal. The appeal was heard before the United States Court of Appeals for the Second Circuit on 9 April 2025 and, by a judgment dated 30 April 2025, the appeal was dismissed and the stay was lifted.

9. Subsequently, a Case Management Conference before District Judge Liman was listed for hearing on 24 June 2025. By a motion filed on 16 May 2025, the Claimants applied to stay the Enforcement Proceedings pending the outcome of the Claimants' claim in England to have the Default Judgment set aside. In the meantime, and without prejudice to the Claimants' stay application, the parties submitted an agreed joint proposed Case Management Plan and Scheduling Order. Those documents provided for initial requests for production of documents to be made by 30 June 2025, discovery to be completed by 31 July 2026 and depositions to be completed by 31 January 2026. Dr Williams himself has already been deposed, because of his age and poor health, over three days in London between 29 April and 1 May 2025. The Enforcement Proceedings would be expected to reach trial by June 2026, though it could be earlier.

10. However, by a Stipulation and Order dated 9 June 2025 (stipulation) and 10 June 2025 (Order of Judge Liman), the parties have stipulated, and the New York Court has, ordered as follows:

> "IT IS HEREBY STIPULATED AND AGREED by and between the undersigned attorneys for the parties that this action is hereby stayed until such time as the High Court of London decides the motion for an anti-enforcement injunction filed by the FEDERAL GOVERNMENT OF NIGERIA and the ATTORNEY GENERAL OF THE FEDERAL GOVERNMENT OF NIGERIA;
>
> IT IS FURTHER STIPULATED AND AGREED that the parties will abide by the decision of the High Court in London insofar as it relates to the motion for an anti-enforcement injunction. If the High Court in London grants the anti-enforcement injunction, then the parties agree to abide by that decision and agree that no further proceedings will take place in this action until such time as the anti-enforcement injunction is vacated. If the High Court in London denies the anti-enforcement injunction, then the parties agree to abide by that decision and agree that they will not seek to file or renew a motion for a stay on the grounds set forth in the proposed Case Management Plan and Scheduling Order submitted by the parties (Docket No. 63).
>
> IT IS FURTHER STIPULATED AND AGREED that the defendants, CENTRAL BANK OF NIGERIA, FEDERAL GOVERNMENT OF NIGERIA and ATTORNEY GENERAL FOR THE FEDERAL GOVERNMENT OF NIGERIA hereby withdraws their motion to stay discovery that is presently pending before the Court."

## (C) PRINCIPLES

### (1) Power to grant an anti-enforcement injunction

11. It is well established that the English court has the power to grant an AEI to restrain a party from seeking to enforce a foreign judgment, even in respect of enforcement in other foreign countries: see *Ellerman Lines v. Read* [1928] 2 KB 144 and *Google v Tsargrad* [2025] EWHC 94 (Comm).

12. In *Google*, I summarised the applicable principles in this way:-

> "82. Viewing this body of case law as a whole, it is possible to identify the following key principles relating to the grant of anti-enforcement injunctions.
>
> i) The fundamental question, pursuant to section 37(1) of the Senior Courts Act 1981, is whether it is just and convenient to grant an injunction.

ii) In principle, the enforcement of a judgment obtained in breach of an exclusive jurisdiction clause or an arbitration agreement can be restrained by injunction (see *Ellerman Lines* and *Bank of St Petersburg*). The order operates *in personam*: like an anti-suit injunction, it is directed to the party, not the foreign court or courts.

iii) There is no distinct jurisdictional requirement that the case be exceptional (see *SAS Institute* § 93).

iv) However, anti-enforcement injunctions are rarely granted, because delay and/or comity considerations usually make it inappropriate to grant such an injunction.

v) As to comity, an anti-enforcement injunction (like an anti-suit injunction) has the effect of indirectly interfering in the processes of a foreign court, and hence a strong step for which clear justification must be required (*SAS Institute* § 101).

vi) The fact that the foreign proceedings were brought in breach of the respondent's obligations under an exclusive jurisdiction clause or arbitration agreement is capable of amounting to such a justification.

vii) It would be particularly intrusive and inconsistent with comity to grant an injunction indirectly preventing enforcement by and in the territory of a foreign court which has already proceeded to judgment (see, e.g., the observations of Neill LJ in *Ellerman Lines* at p437rhc quoted earlier; *Masri* § 93; *Ecobank* § 136 last sentence). Moreover, such an injunction would be liable to result in the resources and time of the foreign court, as well as the respondent, having been wasted, providing a further strong reason against the grant of such relief (*SAS Institute* § 104; *Ecobank* §§ 123, 124, 126, 127, 132, 133, 134, 135).

viii) Where an anti-enforcement injunction prevents enforcement in one or more third countries, the general point about indirect interference with a foreign court applies ((v) above), in relation to both the foreign court which gave judgment and the putative enforcement court. However, if the injunction is sought before or at a very early stage of those enforcement proceedings, concerns about waste of resources and time of the enforcement court should not arise. Such concerns may still arise in relation to the court which gave judgment and in relation to the respondent, but that will depend on the circumstances. The position may be different, for example, if the injunction is not designed to prevent enforcement of the judgment in its entirety, and hence does not render the proceedings leading to judgment a waste of time and resources (*SAS Institute* § 106).

ix) Where the respondent seeks to enforce in a third country, it has been stated that the right to enforce should depend primarily on the law of the enforcement court, which the English court should not pre-empt by granting an injunction (*The "Eastern Trader"* at p.602 rhc; *Akai* at p.1533; *Ecobank* § 136 penultimate sentence). However, in the case of an anti-suit injunction, it is not regarded as a bar to injunctive relief that the overseas

court ought instead to be left to make its own jurisdictional decision (applying its own rules as to the effect of exclusive jurisdiction clauses and arbitration agreements). It is arguable that it is no more intrusive indirectly to interfere with an overseas court's enforcement of a foreign judgment than with an overseas court's adjudicative jurisdiction over a dispute. In any event, there is a cogent argument that an applicant who has contracted for an exclusive jurisdiction clause or arbitration agreement has a *prima facie* entitlement not to be troubled by either substantive or enforcement proceedings elsewhere, and accordingly to seek to hold the respondent to its contractual promise: a view which I consider to be consistent with the observations of Longmore LJ in *Bank St Petersburg* § 35 quoted earlier).

x) It is relevant to consider whether there is a good reason for the applicant not having applied sooner for injunctive relief (by way of anti-suit injunction or anti-enforcement injunction) (as recognised implicitly in *Ecobank* §§ 128), or whether the applicant was simply hoping to have two bites at the cherry (*Ecobank* §§ 129-130).

xi) Delay is an important, and sometimes decisive, factor against the grant of an injunction, but it is not necessarily a bar to relief. Its weight will depend on all the circumstances (*SAS Institute* § 113; *Ecobank* §§ 119, 122 and 137). In assessing the circumstances, account will need to be taken of the considerations identified above. The relevant circumstances will include whether the anti-enforcement injunction seeks to prevent enforcement within the territory of the judgment court or only elsewhere; whether the injunction seeks to prevent enforcement of the judgment in its entirety; whether (if obeyed) it will result in the proceedings leading up to judgment having been a waste of time and resources; and whether there is a satisfactory explanation for the applicant not having applied sooner for injunctive relief."

13. Counsel for the Claimants fairly pointed out that, according to Raphael, *The Anti-Suit Injunction* (2nd ed., 2019) §§5.65-5.72:-

i) *Ellerman Lines* has been interpreted by recent authorities as being confined to cases where it is alleged that the foreign judgment was obtained by fraud (as opposed to cases where the foreign judgment has been obtained in breach of an arbitration or jurisdiction agreement, which is the context in which most anti-suit injunctions are granted).

ii) There are particular considerations of comity which arise in the context of AEIs (over and above the general considerations of comity which apply in the context of ordinary anti-suit injunctions). This is for two reasons: first, because the English court generally respects the ability of foreign courts to apply their own laws when it comes to the recognition and enforcement of foreign injunctions; secondly, issues of comity are especially relevant where the AEI prevents enforcement in the country of the court which gave the underlying judgment because in such a case the AEI is effectively seeking to undo what the foreign court has already done (citing *Ecobank Transnational Inc v. Tanoh* [2015] EWCA Civ 1309 at [110] and [136], and *Masri v. Consolidated Contractors Int (UK) Ltd (No 3)* [2009] QB 503 at [92]-[93]).

14. As to (i) above, for the reasons set out in *Google* §§ [58], [68] and [69], I do not consider the AEI jurisdiction to be limited to cases of actual or alleged fraud. However, the claim in the present case is in any event squarely based on alleged fraud.

15. As counsel for the Claimants also fairly points out, the cases on AEIs concern restrain of enforcement of foreign judgments, and counsel was unable to find a case where an AEI has been granted to restrain enforcement of an English judgment. However, I see no principled reason why such an order should not be available. Indeed, some (though not all) of the comity considerations applicable to enforcement of foreign judgments are less likely to be of concern in relation to an AEI granted by an English court in respect of an English judgment.

**(2) Applicable test**

16. An AEI is sought in the present case not on contractual grounds but on the basis that enforcement of the Default Judgment before the outcome of the present claim to set it aside for fraud would be vexatious and oppressive.

17. In a *dictum* in *Investcom Global Ltd v PLC Investments Ltd* [2024] EWHC 2505 (Comm), [2024] Bus LR 1764 at [81], I accepted a submission that the usual test for a non-contractual anti-suit injunction (assuming the court has jurisdiction) is the *American Cyanamid* one requiring demonstration of a serious issue to be tried, citing *Joint Stock Asset Management Company Ingosstrakh Investments v BNP Paribas SA* [2012] EWCA Civ 644 §§ 49 and 57. Having heard submissions on the point in the present case, I consider that to have been incorrect. In *Ingosstrakh Investments*, Blair J had granted an anti-suit injunction on the ground that the foreign proceedings involved vexatious, oppressive and unconscionable conduct on the part of the respondent. At [83]-[84] of his judgment, Stanley Burnton LJ (with whom the other members of the Court of Appeal agreed) said this:-

> "83. I have already considered most of the Appellant's contentions on its appeal against the grant of injunctive relief. The only remaining submission is that the judge applied the wrong test when deciding that such relief should be granted: he applied the balance of convenience test when he should have required the Bank to establish that there was a high probability of its succeeding in establishing its case for a final anti-suit injunction. I reject this submission. In his second judgment the judge said:
>
> > '7. Insofar as the merits are concerned, the first question on this application for an interim injunction is the test that I should apply. This is alluded to in various parts of the judgment (see for example paragraph 92). The possibilities are the *American Cyanamid* test, or the high probability of the success test which is mentioned, for example, in the *Midgulf International Ltd v Groupe Chimique Tunisien* case and discussed in *The Anti-Suit Injunction* by Thomas Raphael to which I was referred by Ms Selvaratnam QC.

> > 8. The higher test applies where an order for interim relief would be determinative of the matter. I do not think that the relief the claimant seeks is, in fact, determinative for these purposes, but if it is, I refer to the findings I have made in paragraph 92 of my judgment as to the inference which I have concluded can be drawn. I there accept that there is sufficient material to justify drawing the inference that the Russian proceedings are brought with a view to impeding the outcome of the arbitration. Nothing has happened over the past few days to weaken such inference. The events that have taken place are consistent with it and, if anything, lend it some strength. I consider that the threshold merits are satisfied in this case whichever test is applied.'
>
> 84. It is evident from the last sentence of paragraph 8 that Blair J found that the higher test was satisfied. I agree with his assessment of the strength of the Bank's case against D1 and the Appellant. It follows that I see no basis for interfering with his decision to grant interim injunctive relief."

18. That passage indicates that the applicant for an interim injunction on the 'vexatious and oppressive' ground (like an applicant relying on a contractual provision) must generally show a high probability that it will succeed in establishing its case for a final anti-suit injunction at trial.

19. The 'high probability' test is appropriate because an interim anti-suit injunction will often be decisive of the issue by determining, in practice, where the substantive dispute is tried (see, e.g., Raphael § 13.37). The position may be different where the order is granted on a temporary basis in order to 'hold the ring' pending a further hearing or trial and the interim order will <u>not</u> in practice be determinative of the outcome (ibid. § 13.38 and 13.48), in which circumstances an *American Cyanamid* approach may well be appropriate.

**(D) APPLICATION**

20. In the present case, I noted in my substantive judgment dated 8 May 2025 that the Claimants' case on the merits is, on the face of it, a strong one ([130]). Further, there is a compelling case that for Dr Williams to enforce the Default Judgment before this court has determined the Claimants' claim to have it set aside for fraud would be vexatious and oppressive. The proposed interim AEI will not be determinative of the question of forum: it will merely suspend the enforcement proceedings pending determination of whether the Default Judgment should be set aside. However, if necessary, I would conclude that on current evidence it is highly probable that the Claimants will succeed at a trial in establishing that an AEI should be granted.

21. Weighing up the balance of justice, there would be a risk of irreparable prejudice to the Claimants if Dr Williams were able to enforce the Default Judgment before the trial of the present action: the sums paid may be irrecoverable. Conversely, the prejudice to Dr Williams of granting an AEI is more limited: if he succeeds in defending the present action, then he will have suffered some delay in being able to enforce the Default Judgment, but interest will have accrued and he may be entitled to seek compensation

under the cross-undertaking in damages given by the Claimants in Schedule 1 to the AEI.

22. Counsel for Dr Williams did not argue that relief should be refused on the specific ground of delay in applying for an AEI, though he did submit that the proceedings as a whole had taken a long time due to the Claimants' inactivity (the chronology being as summarised in my substantive judgment), and he emphasised Dr Williams' age and ill-health. He sought to reiterate Dr Williams' contentions that there is no evidence of fraud, and no serious issue to be tried in that regard. I do not accept the latter submission. I do bear in mind the length of time that the proceedings have already taken, and Dr Williams' personal position, but consider those points to be outweighed by the fact that the Claimants advance an apparently strong case of fraud.

23. As to comity, as the Claimants point out, this is not a case where they seek to prevent enforcement of a judgment that a foreign court has already issued. To the contrary, the court here is being invited to grant an injunction designed to protect the integrity of the English court's own processes, and to prevent a risk of its own judgment from being used as an instrument of fraud. The New York Court, itself acting consistently with comity, has in effect expressed itself willing to await the outcome of this court's decision on the AEI application: see the Stipulation and Order quoted earlier. Further, because what is sought here is an order restraining enforcement of an English judgment, there is no question of this court seeking indirectly to prevent enforcement in New York of a judgment of the New York courts (cf *Google* at [82(vii)]).

## (E) CONCLUSION

24. In all the circumstances, and notwithstanding the points made above about Dr Williams' personal situation, I have no doubt that the interests of justice require the grant of the AEI sought.